IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 20, 2003 Session

## STATE OF TENNESSEE v. DUANE BRIAN BROOKS

**Appeal from the Criminal Court for Sullivan County**
**No. S43,678     Phyllis H. Miller, Judge**

---

### No. E2002-02040-CCA-R3-CD
### July 10, 2003

---

The defendant, Duane Brian Brooks, was convicted of first degree murder and sentenced to life imprisonment. In this appeal, the defendant asserts that the trial court erroneously instructed the jury as to the culpable mental states for first and second degree murder and failed to provide an instruction on causation. Because it is our view that any error with regard to the jury instructions can be classified as harmless beyond a reasonable doubt, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Stephen M. Wallace, Assistant Public Defender, for the appellant, Duane Brian Brooks.

Paul G. Summers, Attorney General & Reporter; Brent C. Cherry, Assistant Attorney General; and Barry P. Staubus, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On January 17, 2000, the victim, Carol Hendrickson, disappeared from her home. Later, her body was discovered inside her car, which was submerged in Fort Patrick Henry Lake in Sullivan County. She had been strangled to death. The defendant, who was the victim's foster son, admitted the killing.

At trial, the proof established that when the victim did not arrive for work as scheduled on January 17, her co-worker, Nancy Burgess, telephoned the victim's residence. After receiving a busy signal, Ms. Burgess telephoned the victim's sons, Kevin and David Hendrickson, in an unsuccessful effort to ascertain the victim's whereabouts.

David Hendrickson, who initially knew the defendant from school, testified that the defendant came to live with the Hendrickson family as a foster child when the defendant was

seventeen. He recalled that on the morning of his mother's disappearance, one of the victim's co-workers notified him that the victim had not arrived for work. After telephoning the victim and receiving a busy signal, David Hendrickson and his wife, April, drove to the victim's house. When they arrived, they noticed tire tracks next to the sidewalk and discovered that the victim's car was missing. Inside the residence, they noticed that the coffee table and a rug had been moved, a telephone was missing, and some Christmas presents had been taken. The victim's purse was also missing and her dog, which was normally unrestrained, was shut inside a room.

On the next day, David Hendrickson and his siblings gathered at the victim's house to discuss her disappearance. When the defendant arrived, he asked them whether they thought he had killed the victim and stated that the victim would "be okay." There were scratches on the defendant's face and neck, which the defendant claimed to have received during a fight. A new tattoo was on his forearm.

Alicia Hendrickson, the victim's daughter, testified that the victim had informed the defendant that she had added him as a beneficiary to her life insurance policy so that he would feel like a member of the family. She recalled that although the defendant had traditionally celebrated Christmas with the Hendrickson family, he had not done so the Christmas just before the victim's death. She stated that all of the family members purchased presents for the defendant, which the victim kept at her house. She noted that a number of items, including several pieces of jewelry and a coin collection, were missing from the victim's house. The victim's high school ring, which had been kept in a lockbox, was also missing.

According to Ms. Hendrickson, when the defendant arrived at the victim's residence on the day after her disappearance, he said, "The police think . . . that you think I killed your mom." After informing the defendant that she did, in fact, believe he had killed the victim, the defendant responded, "I'd kill myself first." After seeing scratches on the defendant's neck, she pulled his shirt down and saw "nothing but scratches on his chest."

Kevin Hendrickson, the victim's oldest son, testified that after the victim's disappearance, he attempted to locate the defendant, whom he had not seen in a year, but was unable to do so. During the meeting at the victim's house the following day, he heard the defendant say, "I can't believe you all think that I killed Mom." When Kevin Hendrickson commented that only the defendant's Christmas presents and birthday presents had been taken, the defendant denied being responsible for the theft but acknowledged that he had been at the victim's residence the night before her disappearance. The defendant claimed that he had gone to the residence to talk to the victim about a problem he was having with his girlfriend. Kevin Hendrickson testified that the victim did not approve of the defendant's girlfriend.

Gay Vern Moore, payroll and personnel manager for Sullivan County, testified that the victim was a county employee. According to Ms. Moore, the victim had a life insurance policy in the amount of $43,000.00 that was part of her employment benefits package. The defendant was one of the named beneficiaries of the policy.

Lieutenant Reece Christian of the Sullivan County Sheriff's Department, who investigated the victim's disappearance, questioned the defendant and his friend, Jared Fagert. At that time, the defendant gave a statement wherein he acknowledged being at the victim's residence until 4:00 a.m. on the day before her disappearance but denied either harming the victim or taking the missing items. The defendant told the lieutenant that he had received the scratches to his face and neck during an altercation at a Johnson City bar. After the interview, Lieutenant Christian interviewed a number of the defendant's friends in an unsuccessful attempt to verify the defendant's claim that he had been injured in a bar fight.

Several days later, Lieutenant Christian received a message from the defendant: "This is Duane Brooks. I want to know what the hell's going on. I've been stripped of all my friends and I want to talk to you." The lieutenant and another officer went to the residence where the defendant was staying and saw Fagert's car parked behind the house. The defendant and Fagert agreed to separate interviews at the Sheriff's Department and on this occasion, the defendant admitted that he had not been in a bar fight but claimed that he had been injured during the robbery of another individual. He also asked if the police had determined whether the victim's credit cards had been used.

As part of his investigation, Lieutenant Christian discovered a number of items taken from the victim's home in an area near Fort Patrick Henry Lake. It appeared that someone had attempted to burn them. The victim's high school ring was among the charred remains.

Detective Joey Strickler, who questioned the defendant shortly after Lieutenant Christian's interview, testified that after waiving his rights, the defendant admitted that he had killed the victim and dumped her body in the lake. The defendant acknowledged that Jared Fagert dropped him off near the victim's home at approximately 2:00 a.m. The victim, who was dressed in her pajamas, let him inside but, according to the defendant, became angry when she learned that he was dating a girl of whom she did not approve. He claimed that when he tried to leave, the victim grabbed his arm and he "turned around and started choking her with [his] hands." The defendant asserted that he had been involved in a sexual relationship with the victim in the past, but denied having any sexual contact with the victim on the night of her death. The defendant also confessed that he "reached down between the sofa and chair and got . . . a cord or a rope and wrapped it around her neck and pulled it. I used both hands to pull it. She wasn't fighting me when I put the cord around her neck. . . . I believe she was dead."

The defendant stated that he carried the body to the backseat of the victim's car and returned to the house, taking her purse, cash, a lockbox, some jewelry, a cordless phone, and some Christmas presents. He also admitted using one of the victim's credit cards to purchase gasoline for Fagert's car and burning the remaining items near the water. He stated that he drove the victim's car to the edge of the lake, rolled the windows down, and then "got out of the car and put the car in drive." According to the defendant, "[t]he car floated a little bit over to the right about twenty yards and then it went down." He stated that Fagert then picked him up and the two watched the car sink

underneath the water. On the following day, the defendant and Fagert paid for matching tattoos from the cash taken from the victim's purse.

Allen Linkous, coordinator for the Sullivan County Sheriff's Office Underwater Investigation Team, discovered the victim's car during an underwater search of Fort Patrick Henry Lake. According to Linkous, the car was upside down in thirteen feet of water approximately sixty-six feet from the shore. The vehicle was removed from the water by wrecker. Divers also found a metal lockbox a couple of miles from where the victim's car was discovered.

Dr. Ellen Wallen, who performed an autopsy, testified that the victim died as a result of "asphyxia due to manual and ligature strangulation." She explained that the body was well-preserved because it had been submerged in cold water since her death.

I

The defendant contends that the state's burden of proof was lessened by the inclusion of an erroneous definition of intentional. He claims that because first degree murder is a result-of-conduct offense, the trial court erred by providing the statutory definition of intentional that relates to nature-of-conduct offenses, thereby depriving him of the right to trial by jury. The state concedes that the trial court should not have provided the nature-of-conduct definition of intentional but asserts that the error is harmless beyond a reasonable doubt.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. "[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Our law requires that all of the elements of each offense be described and defined in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). Jury instructions must, however, be reviewed in the context of the overall charge rather than in isolation. See Sandstrom v. Montana, 442 U.S. 510 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Any omission in the instructions in reference to an element of the offense which might lessen the burden of proof placed upon the state is constitutional error and requires a new trial unless the error is harmless beyond a reasonable doubt. State v. Walker, 29 S.W.3d 885, 893-94 (Tenn. Crim. App. 1999).

Here, the trial court provided the following instructions regarding first degree murder:

For you to find the defendant guilty of this offense, the State must have proved beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant unlawfully killed the alleged victim; and
(2) that the defendant acted intentionally; and
(3) that the killing was premeditated.

A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

A premeditated act is one done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. If the design to kill was formed with premeditation, it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect. Furthermore, premeditation can be found if the decision to kill is first formed during the heat of passion, but the accused commits the act after the passion has subsided.

In State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), a panel of this court held that because second degree murder is a result-of-conduct offense, the trial court erred by including the nature-of-conduct and nature-of-circumstances[1] definitions of knowingly. Further, the panel determined that the error could not be classified as harmless beyond a reasonable doubt because the defendant's mental state was a contested issue at trial. Id. at 789-90. In other cases addressing this issue, this court has determined that error with regard to the definition of the culpable mental state may qualify as harmless beyond a reasonable doubt where *mens rea* is not a disputed issue at trial. See, e.g., State v. Theron Davis, No. W2002-00446-CCA-R3-CD (Tenn. Crim. App., at Jackson, May 28, 2003).

As indicated, the defendant was convicted of first degree premeditated murder, which requires that the defendant act intentionally. In State v. Antoinette Hill, No. E2001-02524-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Dec. 13, 2002), the defendant, who was convicted of first degree murder, complained that the trial court erroneously provided the nature-of-conduct definition of intentionally. A panel of this court determined that the trial court should not have provided the nature-of-conduct definition of intentional because first degree premeditated murder, like second degree murder, is a result-of-conduct offense. The panel ruled, however, that because the defendant had been convicted of first degree murder, which requires a finding that the defendant acted with premeditation, the error could be classified as harmless beyond a reasonable doubt. Id., slip op. at 6.

Here, the defendant never asserted that he acted other than intentionally when he killed the victim and instead asserted that he did not act with premeditation. In fact, during closing argument defense counsel conceded that the defendant killed the victim and stated, "It was an intentional act."

---

[1] "[A] person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b).

Further, by its verdict, the jury in this instance concluded that the defendant acted with premeditation, that is to say that he displayed a previously formed design or intent to kill. See State v. West, 844 S.W.2d 144, 147 (Tenn. 1992); Antoinette Hill, slip op. at 6. Implicit in a finding of premeditation is that it was the defendant's desire to cause the result of his conduct, i.e. the death of the victim. Because the jury determined that the defendant acted with the design to kill, it is our view that the inclusion of the nature-of-conduct definition of intentional would be harmless beyond a reasonable doubt. See Antoinette Hill, slip op. at 6.

The defendant also contends that the trial court erred by providing the nature-of-conduct and nature-of-circumstances definitions of the culpable mental state of knowing in its instructions on second degree murder. He asserts that the erroneous definition compounded the trial court's error with regard to the erroneous definition of intentional. As indicated, the defendant conceded that he acted intentionally. Additionally, the jury necessarily determined that the defendant acted with premeditation when he killed the victim. It is our view that a finding of premeditation encompasses a finding that the defendant acted knowingly. In consequence, any error with regard to the definition of knowing would qualify as harmless beyond a reasonable doubt. See id.; see also Page, 81 S.W.3d at 789.

II

Finally, the defendant, citing State v. Farner, 66 S.W.3d 188, 206 (Tenn. 2001), asserts that the trial court committed reversible error by failing to provide a jury instruction on causation. The state submits that the cause of the victim's death was not contested at trial and thus any error is harmless beyond a reasonable doubt.

In Farner, the defendant was convicted of criminally negligent homicide and other offenses as a result of his participation in a drag race with the victim. Our supreme court ruled that "causation is an element of every homicide offense and the jury should be so instructed." The high court went on to say, however, that "[i]n the vast majority of cases, causation is not disputed, so omitting this instruction would be considered harmless error." Id. Here, the defendant admitted strangling the victim, placing her dead body in her car, and rolling the car into the lake. The victim's cause of death was not a contested issue at trial. In consequence, the trial court's failure to instruct the jury as to cause of death qualifies as harmless beyond a reasonable doubt. See id.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE