IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 22, 2015

**STATE OF TENNESSEE v. KENNETH LEE BOLES**

**Appeal from the Circuit Court for Bedford County**
**No. 17682     Franklin Lee Russell, Judge**

---

**No. M2014-01030-CCA-R3-CD – Filed June 19, 2015**

---

The defendant, Kenneth Lee Boles, was convicted by a Bedford County jury of the introduction of a controlled substance into a penal institution and the possession of a controlled substance in a penal institution, both Class C felonies. After merging the counts into a single conviction, the trial court sentenced the defendant as a Range II, multiple offender to ten years in the Department of Correction. On appeal, the defendant argues that the trial court erred by not allowing him to present the testimony of his expert witness and by not instructing the jury on the defense of necessity. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Michael P. Auffinger, Lewisburg, Tennessee, for the Appellant, Kenneth Lee Boles.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Robert James Carter, District Attorney General; and Richard A. Cawley, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTS**

On January 9, 2013, correctional officers at the Bedford County Workhouse saw the defendant, who was serving a forty-eight-hour sentence at the facility, kneeling in his cell in the apparent act of snorting some crushed powder into his nostrils. Officers searched the cell and found three pills that were later identified as Roxicodone, which is a

brand name for oxycodone, and methadone. The defendant was subsequently indicted by the Bedford County Grand Jury with one count of the introduction of a controlled substance into a penal institution and one count of the possession of a controlled substance in a penal institution.

Prior to trial, the defendant filed a notice of his "intent to introduce expert testimony relating to the mental condition of the Defendant." Specifically, he sought to introduce the testimony of a nurse practitioner about the defendant's Post-Traumatic Stress Disorder ("PTSD") and his fear that he would die during the forced withdrawal of his opiate pain medication during his incarceration. At the January 2, 2014 evidentiary hearing, Chandler Anderson, a board certified family nurse practitioner and a certified emergency nurse with eight years of experience, testified that he was familiar with "pain narcotics," including the withdrawal symptoms associated with their discontinued use. He said he had reviewed the defendant's medical records and also spoken with him. Approximately three years earlier, the defendant had been in a serious motor vehicle accident that caused him to sustain severe injuries, including a below-the-knee amputation of one leg. As a result, the defendant was "placed on Xanax to help manage a post-traumatic stress disorder and . . . was titrated . . . from Lortab to oxycodone to . . . methadone for pain management." Anderson described the withdrawal symptoms experienced by patients who abruptly cease opiate pain medication:

> The opiate withdrawal process, people in the early stages tend to get irritable, they tend to have increased anxiety, they sweat more, but the later effects, after about 48 hours, they start to be nauseated, vomit, they start to have diarrhea, intense stomach cramps, they can become more irritable, and even have . . . a confused [mental] state.

Anderson testified that the withdrawal symptoms associated with the abrupt cessation of Xanax, or benzodiazepine, were worse:

> Well, again, the opiates would cause the nausea, vomiting, diarrhea, abdominal pain. Those withdrawals aren't as significant as those of benzodiazepine or Xanax withdrawals. Those people can actually have seizures, and benzodiazepine withdrawals, you can actually die from versus opiates which just make you feel very miserable.

Anderson testified that the defendant's "dosing gives three times a day," so the six pills the defendant reported that he had brought with him to the jail would have constituted "two days worth of medication." When asked again his opinion of the effect of the defendant's not having that medication for forty-eight hours, he replied that "at the 48-hour mark, again, he would have irritability, maybe some confusion, nausea,

vomiting, diarrhea, abdominal cramping, sweating. Those would be the symptoms of the opiate withdrawal."

Anderson testified that the defendant informed him of a previous period of incarceration in which he had been denied access to his medication and had gone through "withdrawals," with his primary symptom being that he was "confused and disoriented." He said the defendant was diagnosed with PTSD after his motor vehicle accident and that patients with PTSD "typically have a feeling of impending doom and with a magnified fear of dying." He opined that the combination of the defendant's PTSD and his previous experience with severe withdrawal made him believe he had no choice other than to take his prescribed medication with him into the jail:

> Well, again, if you're already afraid that you're going to die at . . . a heightened level than the normal person and you've experienced this, terrible side effects of withdrawals before, it's reasonable to say while you're not in withdrawals at the time that you go in that you are, you could be in fear that you're going to get that sick again because you, "A", you've experienced it before and, "B", you have what appears to be, to other people, an irrational fear of dying. But it's documented well in the DSM-5, which is the new criteria for diagnosing people with PTSD, that those people have what appears to be an unreasonable fear of dying, so.

> My opinion is that he approached the jail and he told the nurse this is what, this is what I'm on, I've been through withdrawals before, because that's what he told me, and he was told by the nurse that their policy is not to administer any narcotics, because, again, that's what he told me, so, you know, he made the nurse aware this is what he was on, he was afraid of going through withdrawals again so he was turned away. So, you're put in a situation where you have to choose do I just go through withdrawals again or do I bring medicine in. I've been told no, so what do I do.

At the conclusion of the hearing, the trial court observed that the defendant's fear of withdrawal symptoms was not a recognizable defense to the offenses and ruled that Anderson's proposed testimony was irrelevant and inadmissible. On January 8, 2014, the trial court entered a written order disallowing the testimony.

Since many of the facts are not in dispute, we can summarize a good bit of the testimony at the defendant's January 13, 2014 trial as follows. A day or two before the defendant was booked into the workhouse on January 9, 2013, to begin serving a forty-eight-hour sentence, he and his parents arrived at the facility with his prescription pain medication, only to be told that he could not bring it with him into the workhouse. He

was told to direct his questions about the medication to the sergeant in charge, who referred him to the jail nurse.

According to the defendant's mother, the defendant was told he could not have his medications with him in the workhouse and was directed to call "Nurse John" to talk about his concerns. The defendant's mother testified that she called "Nurse John" on the defendant's behalf, and that, while sympathetic, he was unable to help, telling her, "I don't know," when she asked what they should do about the defendant's need for medication.

When the defendant returned on January 9 to begin serving his sentence, he said nothing about being on oxycodone and methadone, reporting only that he was taking gabapentin, a non-narcotic medication generally used to treat neuralgia and nerve pain. The defendant was searched but managed to smuggle a two-day supply of his narcotic pain medication into the workhouse with him. The defendant was placed in a medical observation cell because of his amputation, and during a routine check a correctional officer observed him on his knees in the act of snorting some powder into his nostrils through a rolled up piece of cardboard.

Charles Timothy Lokey of the Bedford County Sheriff's Department, the administrator of the workhouse, testified that "the standard procedure . . . was that narcotics were not allowed in the correctional facility." He said that there had been one or two occasions during the seven years he had been administrator that narcotics were administered but that it was "under strict supervision and . . . isolated because of the potential abuse of those narcotics in the facility." Whether narcotics were administered was a decision left "to the medical staff." He stated he had seen inmates undergoing "detox symptoms" over the years, and the medical staff had medications they administered to help with that process. He testified that a nurse was on duty during the day at the nearby jail and that in the event of an emergency, the nurse could reach the workhouse "in less than five minutes." During after hours, they had the ability to contact the main nurse "and get medical attention right then via ambulance or whatever it may be."

Janet Harrison, an LPN who worked at the Bedford County Jail during the relevant time period, testified that the procedure for inmates who were on "life-saving" or essential, non-narcotic medication such as blood pressure or diabetes medication was to report and turn over their medications to the correctional officers during intake. The correctional officers would, in turn, deliver the medications to the nurse. After first calling the pharmacies to verify the medications, the nurse would then "pack [those] medications" to dispense to the inmate on the appropriate schedule. She said that it was her understanding that narcotics were not allowed in the jail and that she had only once

4

during the two and half years she worked there seen a narcotic administered.  In that instance, the narcotic was actually prescribed by the medical director at the jail.

Harrison testified that the jail had a protocol in place for dealing with inmates who were experiencing withdrawal symptoms, which included monitoring their vital signs and administering various vitamins and medication, such as Librium and anti-seizure medication.  During the time she worked there, a nurse was on duty at the jail from 5:30 a.m. to 6:00 p.m., and there was always a nurse or "medical team administrator" on call after the regular shift hours.

The defendant's mother described the terrible injuries the defendant had sustained in his motor vehicle accident two years earlier, which included a crushed face, a broken jaw, a broken back, broken ribs, broken pelvis, collapsed lungs, and the below-the-knee amputation of his left leg.  She also described how the correctional officers turned the defendant away from the jail when he arrived with his pain medications and how "Nurse John" had told her about his own father's leg amputation and constant pain but provided no help with respect to the defendant's need for pain medication.

The defendant described his injuries and testified that a few weeks after his accident he asked to be taken off his morphine and other narcotic drips because he was a recovering narcotics user who had been clean for a year before the accident.  The medical staff, however, told him he "couldn't handle the pain."  He said he then asked to be put on something that was not as strong and "that's when they started putting [him] on [his] methadone and [his] Roxis and [his] Xanaxes."  He testified that he had a lawful prescription for the methadone and oxycodone he brought with him to the jail and that he brought only enough medication to cover his forty-eight-hour sentence.  He stated he had recently had another leg surgery and that his stump was still bandaged when he entered the jail.  Also, in the past he had experienced a seizure and had to be transported to the emergency room after going three days without his Xanax and methadone.  He explained the effect these various experiences had on him:

> It just feared (sic) me that I'd get in there and go through withdrawals and they would just let me lay there for 48 hours and my body would shut down.  I was just, I was, I was still traumatized.  I was still going through surgeries. . . .
>
> . . . .
>
> And I been in withdrawals before over my Xanaxes and my methadone and my Roxis and stuff, and I knowed what the side effects was.  And knowing that nobody was there and knowing that the nurse didn't,

5

wouldn't come and check on you, I knowed what it was like.  And I didn't, I didn't, I didn't want to put myself in harm or put others in harm with myself.

## I.        Disallowance of Expert Witness Testimony

The defendant first contends that the trial court abused its discretion by disallowing the testimony of his expert witness.  He argues that Nurse Practitioner Anderson's testimony about his mental state at the time of the offenses was based on the nurse practitioner's review of "sufficiently trustworthy and reliable" medical records and would have "substantially assisted the trier of fact."  The State responds that the trial court properly precluded the testimony of Nurse Practitioner Anderson on the basis that he was not qualified to deliver his opinion on any psychological, psychiatric, or pharmacological question.  We agree with the State.

The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703.  Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 provides that expert testimony shall be disallowed "if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703.

In McDaniel v. CSX Transp. Inc., 955 S.W.2d 257, 265 (Tenn. 1997), our supreme court recited several nonexclusive factors that a court may consider in determining the reliability of scientific testimony, including:

"(1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation."

Brown v. Crown Equipment Corp., 181 S.W.3d 268, 274 (Tenn. 2005) (quoting McDaniel, 955 S.W.2d at 265).  The Brown court identified two other factors that a trial court may consider in assessing the reliability of an expert's methodology: (1) the expert's qualifications for testifying on the subject at issue, and (2) the connection between the expert's knowledge and the basis for the expert's opinion.  Id. (citations omitted).

6

"[T]he allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Rhoden, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987) (citations omitted). As such, we will not disturb the trial court's ruling absent a clear showing that it abused its discretion in admitting the testimony. Id.; State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002).

We find no abuse of discretion in the trial court's disallowance of the testimony. In its written order, entered on January 8, 2014, the trial court found, among other things, that "the proposed expert's qualifications to testify on psychological, psychiatric or pharmacological issues were not proven" and "the fact that the Defendant feared withdrawal" from his prescribed medication "does not provide a defense to the charge and does not negate the intent required by the statute to commit this crime." The court further found that there was "no necessity defense to this charge under these circumstances" and "[t]hat the expert did not propose to present any evidence that the Defendant was in withdrawal on the date of the alleged crime, but only to present testimony of the Defendant's likely physical condition if he did not receive the drugs while in jail[.]"

The testimony presented by Nurse Practitioner Anderson at the pretrial hearing supports the findings and conclusion of the trial court. Accordingly, we conclude that the trial court correctly determined that the proposed testimony of the nurse practitioner about the effects of opiate pain medication withdrawal was not relevant to any issue at trial and would not have substantially assisted the jury to understand the evidence or determine any facts at issue in the trial. The defendant is not entitled to relief on the basis of this issue.

## II.     Jury Instruction on Defense of Necessity

The defendant next contends that the trial court erred by not instructing the jury on the defense of necessity. He argues that the evidence at trial, which included his previous experiences with severe withdrawal symptoms, fairly raised the applicability of the defense and warranted an instruction by the trial court. The State argues that the trial court appropriately concluded that the facts did not warrant such an instruction. We, again, agree with the State.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a

complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citation omitted). This includes an instruction on the defense of necessity if the defense is fairly raised by the proof. Id.

The defense of necessity is codified at Tennessee Code Annotated section 39-11-609, which provides in pertinent part that "conduct is justified if":

> (1) The person reasonably believes the conduct is immediately necessary to avoid imminent harm; and

> (2) The desirability and urgency of avoiding the harm clearly outweigh the harm sought to be prevented by the law prescribing the conduct, according to ordinary standards of reasonableness.

Tenn. Code Ann. § 39-11-609 (2014).

The sentencing commission comments explain how rarely the defense applies:

> This section codifies the common law defense of necessity. It excuses criminal liability in those exceedingly rare situations where criminal activity is an objectively reasonable response to an extreme situation. For example, the necessity defense would bar a trespass conviction for a hiker, stranded in a snowstorm, who spends the night in a vacant cabin rather than risking death sleeping in the open.

> The defense is limited to situations: (1) where the defendant acts upon a reasonable belief that the action is necessary to avoid harm; and (2) where the harm sought to be avoided is clearly greater than the harm caused by the criminal act. The defense is further limited in application to those offenses where it is not expressly excluded by statute.

> Subdivisions (1) and (2) contemplate a balancing between the harm caused by the conduct constituting an offense, and the harm the defendant sought to avoid by the conduct. If the harm sought to be avoided was, by ordinary standards of reasonableness, clearly greater than the harm actually caused (the offense), the defendant's conduct causing the offense is justified.

The trial court found that the facts did not warrant a jury instruction on the defense of necessity, noting that the defendant was incarcerated for a relatively short period of time in a medical observation cell and that there were procedures in place to handle

inmates undergoing withdrawal from pain medication, including actions to be taken in an emergency situation.

We find no error in the trial court's ruling. As the trial court observed, the testimony of jail officials established that there were procedures in place to deal with inmates undergoing withdrawal symptoms. We note that the defendant's proposed expert testified that the withdrawal symptoms associated with the cessation of opiate pain medication, which is the only type of prescription medication the defendant smuggled into the jail, were not nearly as severe as the withdrawal symptoms associated with the cessation of benzodiazepine or Xanax, which could cause seizures or even death, "versus opiates which just make you feel very miserable."

We are not unsympathetic to the defendant's desire to avoid pain or the withdrawal symptoms associated with missing his scheduled pain medication. However, the defendant's belief that he would die without his medication was not reasonable, and his feeling "miserable" without the pain medication is not the type of imminent harm contemplated by the statute. Accordingly, we conclude that the defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

9