IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2017

## STATE OF TENNESSEE v. BRANDON COLE-PUGH

**Appeal from the Circuit Court for Madison County**
**No. 16-109    Donald H. Allen, Judge**

_____

### No. W2017-00469-CCA-R3-CD
_____

Following a jury trial, the defendant, Brandon Cole-Pugh, was convicted of being a felon in possession of a handgun and sentenced to eight years. On appeal, the defendant challenges the trial court's denial of his request for an instruction on the defense of necessity. Having thoroughly reviewed the record, we conclude the trial court did not err in denying the defendant's request on the defense of necessity.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Daniel J. Taylor, Jackson, Tennessee, for the appellant, Brandon Cole-Pugh.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Jody Pickens, District Attorney General; and Aaron Chaplin, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

On November 22, 2015, the defendant engaged in a fight at the Gold Line gas station in Madison County, Tennessee. Subsequent to the fight, a shooting occurred on the Gold Line premises, leaving two people injured. Video footage from the store captured the defendant participating in the fight and then exiting the store holding a gun. As a result, the defendant was charged and convicted of being a felon in possession of a handgun under Tennessee Code Annotated section 39-17-1307.[1]

_____

[1] Though dismissed prior to trial, the defendant was also initially indicted for a violation of the gang enhancement statute pursuant to Tennessee Code Annotated section 40-35-121.

At trial, the State relied heavily on the video footage of the fight entered into evidence by Zaid Alshaif, the owner of the Gold Line. Mr. Alshaif stated he was called to the store in the early morning hours after the fight and shooting occurred. When Mr. Alshaif arrived at the store, he saw "everything destroyed from the fight." He provided law enforcement with copies of the video footage depicting both the inside and outside of the store. This footage was then played for the jury at trial. Mr. Alshaif explained that while the time-stamp on the videos noted the correct time, the date was labeled one day ahead.

Officer Paul Bozza of the Jackson Police Department obtained copies of the video footage from Mr. Alshaif after he responded to "a shots fired call" at the Gold Line at approximately 1:45 a.m. on November 22, 2015. When he arrived at the scene, Officer Bozza learned "a girl" was shot in the leg "or hip area" and was laying in the backseat of a vehicle on the north side of the Gold Line property. While treating the female victim, Officer Bozza spoke with the defendant who stated the victim was his girlfriend.

Officer Bozza "knew the Gold Line had video," and he reviewed the footage in order to determine what happened prior to his arrival. In reviewing the video footage, Officer Bozza identified the defendant in the video wearing "goldish color pants, copper color pants and a black like a zip-up jacket-type deal and white hat." According to Officer Bozza, the video footage depicted the fight that occurred inside the store, the defendant's participation in the same, the defendant outside of the store carrying a handgun, and the shooting that occurred outside of the store. Though Officer Bozza admitted the video footage did not capture everything that happened inside or outside of the store, he affirmed "there's no doubt [the defendant] had a gun in his hand period."

Officer Bozza testified he "had prior knowledge that [the defendant] was a convicted felon." He "checked [the] crime portal just to verify that[,]" and then began questioning the defendant on the scene. Specifically, Officer Bozza asked the defendant "where he put the gun." The defendant denied having a gun, and Officer Bozza arrested the defendant. Officer Bozza stated the defendant is seen holding a gun in the video footage "showing right at the outside door." Upon his arrest, officers searched the defendant but did not find a gun on his person or in his car.

In detailing the video footage to the jury, Officer Bozza further testified as the "altercation starts," the defendant is seen fighting inside the store. Though Officer Bozza did not know whom the defendant was fighting in the video, he stated he saw "the [d]efendant coming out of the store holding a gun to his side." According to Officer Bozza, the first time the gun is seen on the video is when the defendant exits the store holding it in his right hand. Once outside the store, the defendant is seen walking around

in front of the store holding the gun, though he does not point it at anyone. Additionally, Officer Bozza describes the defendant as seen on the video, as follows: "And there's the [d]efendant right there. He's got a pistol, silver pistol beside his side, and he's trying to go back into the store. And then he has some kind of little standoff with this guy here." From another video angle, however, Officer Bozza could only testify that he saw a "shiny object" in the defendant's right hand while in his left hand, the defendant held a shoe. In describing the video footage prior to the shooting, Officer Bozza testified:

> Yes. Okay. You can see [the defendant] right now. He's up in the top part of the screen up here, and his girlfriend still pulling him, and it appears that he still had the shiny handgun to his side as she was pulling him back towards the car. And you'll see her, she's trying to pull him again, and this is your shooter. He's going to come up, point in the direction that [the defendant and his girlfriend are] at, and fire two rounds.

The State rested its case on the testimony of Officer Bozza and Mr. Alshaif. Prior to resting, however, the parties stipulated to the following: "[The defendant] has been previously convicted of a felony involving the attempted use of force, violence, or a deadly weapon in Madison County, Tennessee Circuit Court Docker Number 08-714."

Michael Douglas then testified on behalf of the defense. Mr. Douglas stated he knew the defendant and the female victim and saw them at the Gold Line on November 22, 2015. As he and the defendant approached the store, he noticed "a commotion going on inside the store." Once inside, the two men saw "[the defendant's] sister and two guys [] having a disagreement where it looked like they [were] just arguing about some type of certain situation." The defendant "asked his sister what was going on, what the commotion was, and soon as he said that, the dude walked up and said something and took a swing at [the defendant] and that['s] when they got to tussling." Mr. Douglas did not know the name of the man with whom the defendant was fighting, but believed the defendant was defending himself.

According to Mr. Douglas, the store was filled with people who surrounded the fight between "the dude" and the defendant. As the defendant and "the dude" were "tussling," a gun fell out of "the dude's" jacket. Mr. Douglas further explained:

> The dude [the defendant] was tussling with and his friend, they were trying to go for the gun, so [the defendant] ended up getting the gun before they even can get to it. . . . And when [the defendant] grabbed the gun, that's when [the] dude ended up getting off the ground that was tussling with [the defendant] and was going -- ran out the store and when [the defendant] got up off the floor, he ended up coming outside the store with

- 3 -

the gun, holding it down to the floor. [The defendant] never, you know, he never pointed it at anybody [as] far as I know of, and when he came back in the store and came back out, I never seen it. When [the defendant] came inside the store with the gun and came back out, I never seen it in his hand.

Once back outside, Mr. Douglas approached "the dude" who fought with the defendant inside the store and tried to diffuse the situation. The defendant, the defendant's girlfriend, and Mr. Douglas began walking away from "the dude," and that is "when gunshots went off." The bullets hit the defendant's girlfriend in the leg and Mr. Douglas in the lower back. The defendant was not hit. Mr. Douglas did not see the defendant with a gun at the time of the shooting. Mr. Douglas fled the scene to the Burger King parking lot across the street where he received medical attention, and the defendant stayed with his girlfriend.

During cross-examination, Mr. Douglas confirmed he saw the defendant holding a gun inside the store and saw him walking around outside the store with a gun on November 22, 2015. However, the State pointed out that in his statement to police, Mr. Douglas did not include that he saw "anybody reaching for [the gun]" after it dropped on the floor during the fight. Mr. Douglas also stated the defendant is his cousin. Mr. Douglas believed the gun the defendant held that night was either silver or chrome.

In summary, as seen in the video footage played for the jury, the defendant exits the store holding a silver gun in his right hand down to the side of his body. He is missing his left shoe as he walks around the storefront holding the gun in his right hand. The defendant briefly goes back inside the store, presumably to get his missing shoe, and then exits. After exiting the store a second time, the defendant begins to walk away from the storefront. However, while still in the camera shot, the defendant stops and has a "standoff" with another man. The defendant does not point a gun at the man, and after several seconds, the two men walk away from each other. During the standoff, the defendant's back is to the camera, his shoe is seen hanging from his left hand, and his right arm is being held across his midsection, the contents of which are not seen from this angle. Mr. Douglas then approaches the other man, and the defendant is no longer seen in the video. From a different angle, the shooter is later seen approaching the gas pump area with a gun behind his back, firing shots towards the area of the defendant, his girlfriend, and Mr. Douglas, and then running away.

During a jury-out hearing, the defendant requested jury instructions on the defense of necessity and self-defense, which the trial court denied holding the evidence did not support either instruction. The jury convicted the defendant, as charged, of being a convicted felon in possession of a handgun. For the conviction, the trial court imposed an eight-year sentence on the defendant, a Range II, multiple offender. At the hearing on

the defendant's motion for new trial, the defendant argued the evidence was insufficient to sustain his conviction and that the trial court erred in not instructing the jury on the defense of necessity. After hearing arguments from the parties, the trial court ruled the evidence was sufficient to sustain the defendant's conviction and that the necessity instruction was not warranted. This timely appeal followed.

## ANALYSIS

The defendant contends the trial court erred in failing to provide the jury with an instruction on the defense of necessity, arguing the testimony of Mr. Douglas fairly raised the issue at trial. The State asserts the defendant has waived this issue by failing to request the jury instruction in writing. Furthermore, the State argues the defense of necessity is not applicable to the facts of the case. After our review of the record, we agree with the State.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). The defense of necessity should be charged if supported by the facts produced at trial, however, because it is not an affirmative defense, "the defendant need not prove [necessity] by a preponderance of the evidence." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Culp*, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994)). Instead, if the evidence "'fairly raises' the defense, the trial court 'must submit the defense to the jury and the prosecution must 'prove beyond a reasonable doubt that the defense does not apply.'" *Id.* (quoting *Culp*, 900 S.W.2d at 710) (internal quotations omitted). "Failure to charge the jury as to the defense of necessity can be reversible error where the facts fairly satisfy the elements." *Id.* (quoting *State v. Bobby Ray Jenkins*, No. 03C01-9202-CR-50, 1992 WL 227547 at *3 (Tenn. Crim. App., Sept. 18, 1992)).

With respect to the defense of necessity, Tennessee Code Annotated section 39-11-609 provides unlawful "conduct is justified if: (1) [t]he person reasonably believes the conduct is immediately necessary to avoid imminent harm; and (2) [t]he desirability and urgency of avoiding the harm clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness." Tenn. Code Ann. § 39-11-609; *see* T.P.I. - Crim. 40.05 (19th ed. 2015). The defense of necessity "excuses criminal liability in those exceedingly rare situations where criminal activity is an objectively reasonable response to an extreme situation." Tenn. Code Ann. § 39-11-609, Advisory Comm'n Cmts. Therefore, the defense is applicable in situations "(1) where the defendant acts upon a reasonable belief that the action is necessary to

avoid harm; and (2) where the harm sought to be avoided is clearly greater than the harm caused by the criminal act." *Id.* This Court has previously explained, "necessity requires an immediately necessary action, justifiable because of an imminent threat, where the action is the only means to avoid the harm." *Davenport*, 973 S.W.2d at 287 (providing that "[e]xamples of necessity include a ship violating an embargo law to avoid a storm, a pharmacist providing medication without a prescription to alleviate someone's suffering during an emergency, or where two sailors are shipwrecked and one pushes the other off the float to save his own life") (internal citations omitted).

Here, the defendant asserts the defense of necessity was fairly raised by the evidence produced at trial arguing he "picked up the handgun and possessed it out of necessity to prevent a greater harm." The record, however, disagrees. The evidence produced at trial shows the defendant engaged in a fight inside the Gold Line store, picked up a gun that fell to the floor during the fight, exited the store holding the gun in his right hand, walked around outside of the store still holding the gun, stood off against another man for several seconds while outside of the store, and then walked towards his car. Based upon this evidence, the defendant cannot show how his actions were "immediately necessary to avoid imminent harm." Tenn. Code Ann. § 39-11-609. Though Mr. Douglas stated at trial that he saw the defendant and the man with whom he was fighting both reach for the gun, the defendant failed to provide evidence showing the man with whom he was fighting was trying to use the gun at the time. Instead, after the defendant began fighting with another man, he picked up the gun, exited the store holding the gun in his right hand, and continued holding the gun in the area immediately outside of the store. Though related, the subsequent shootings of the defendant's girlfriend and Mr. Douglas were separate events from those at issue here. As such, the defendant has failed to show how picking up the gun dropped during the fight and walking around with it helped to avoid greater or imminent harm as a shooting still occurred after the initial fight. Accordingly, nothing in the record indicates the defendant's action of possessing the gun in any way delayed or hindered the subsequent violence, and the trial court was correct in finding the evidence produced at trial did not fairly raise the defense of necessity as to the defendant's actions. The defendant is not entitled to relief.

In denying the defendant's motion for new trial on his claim, the trial court stated, "there was really no proof presented that would somehow justify instructing on necessity, you know." We agree with the trial court's assessment of the evidence and its relation to the defendant's request for an instruction on the defense of necessity. The defendant has failed to demonstrate he faced an imminent threat avoidable only by immediate action on his part which warranted the necessity instruction at trial. Accordingly, the trial court did not err in denying the defendant's request for an instruction on the defense of necessity, and the defendant is not entitled to relief.

_____
J. ROSS DYER, JUDGE