PUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Malveaux and Raphael
Argued at Williamsburg, Virginia


ERICA RAKIA EVANS

v.        Record No. 1996-23-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE STUART A. RAPHAEL
NOVEMBER 19, 2024


FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
Robert H. Sandwich, Jr., Judge

Eric Weathers, Assistant Public Defender (Kelsey Bulger, Deputy
Appellate Counsel; Virginia Indigent Defense Commission, on
briefs), for appellant.

Brooke I. Hettig, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Appealing her conviction for felony hit-and-run, Erica Rakia Evans claims that the

Commonwealth failed to prove that she was "involved" in the accident within the meaning of

Code § 46.2-894.  She also argues that she satisfied any obligation she might have had to help

"*any* person injured in such accident," *id.* (emphasis added), because she helped one of the four

people who were hurt.  Rejecting both claims, we affirm her conviction.

BACKGROUND

We view the facts in the light most favorable to the Commonwealth, the party that

prevailed at trial.  *Camann v. Commonwealth*, 79 Va. App. 427, 431 (2024) (en banc).  "Doing

so requires that we 'discard' the defendant's evidence when it conflicts with the

Commonwealth's evidence, 'regard as true all the credible evidence favorable to the

Commonwealth,' and read 'all fair inferences' in the Commonwealth's favor."  *Id.* (quoting

*Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

In the middle of the night on October 3, 2020, Evans left home in search of her live-in boyfriend, Dameyon Wilson. Evans was eight months pregnant with their third child. Wilson had left while she was asleep. He drove away in a sport-utility vehicle that Evans had rented, a white Dodge Durango. Wilson did not have her permission to take the Durango. Nor did he have a driver's license.

Spotting the Durango in downtown Suffolk, Evans followed him. Three female passengers were in the Durango with him—Auriona M. (age 19), her younger sister A.M. (age 17), and A.M.'s best friend, J.J. (age 19).[1] Wilson had invited the women to ride with him to a Wawa, promising to buy them snacks. When they got into the Durango, Wilson was drunk and smelled of alcohol. Shortly into the ride, as Evans repeatedly called Wilson, the women noticed that Evans's name kept "popping up" on the Durango's infotainment screen connected by Bluetooth to Wilson's phone. The women also noticed that they were being followed by a white Volkswagen Passat. Wilson told them that Evans was driving the Volkswagen.

Wilson changed direction and "started driving real fast," but Evans tailed him. Evans drove "bumper-to-bumper" behind the Durango. The women all testified that they were scared. They begged Wilson to stop and let them out, but he said he couldn't do that with Evans so close behind. So he kept driving "really fast." Wilson would accelerate to get away, but Evans caught up each time. Auriona testified that Evans was "right there on us" each time. A.M. testified that Evans was "acting crazy." As the women begged to be let out, Wilson turned up the music and told them to "sit back." The women all fastened their seatbelts.

The chase lasted for about an hour until the accident at issue here. Evans followed Wilson onto Hozier Road, a dark and curvy road with no streetlights. After several "twist[s] and

---

[1] We omit the victims' identities to protect their privacy.

turns," Auriona felt a "lunge," as if Evans had "pushed the car." J.J. too felt the Durango "being knocked off the road" from behind. A.M. testified that she "heard a loud bang" from the back.

As Wilson lost control, the Durango flipped over three or four times on its side, hit a tree, and landed upside down in a ditch. Photographs introduced into evidence depicted what was left of it:

 

The four occupants survived, but they were all injured. One by one, they crawled out through the Durango's shattered rear window.

As they got to their feet, Evans drove past them and made a U-turn to come back, stopping across the street from the wreckage. Evans got out of her Volkswagen and asked Wilson, "Was it worth it? Was it really f---ing worth it?" Then she opened a door to the Volkswagen and told Wilson to "get [his] stupid ass in the car."

Wilson had suffered a gash to his face, and his lip was bleeding. But he obeyed. After Wilson limped over and got into her car, Evans drove off. Evans said nothing to the women she left behind. Auriona testified that she was wearing shorts and her knees were "visibly" injured, being "all banged up" from the accident and from having to crawl over broken glass to get out.

Auriona used her phone to call 911. The audio recording of that call was introduced into evidence. Auriona, audibly distraught, reported that her legs were bleeding, that her sister's ribs were hurting, and that Evans had chased them around Suffolk. Auriona said that Wilson was

drunk and had tried to get away from Evans. All three women were taken by ambulance to a hospital for treatment.

In addition to scratches and bruises, Auriona suffered a whiplash injury to her neck that required three months of physical therapy. A.M. suffered an injury to her wrist, hurt "all over," and required two months of physical therapy. J.J.'s back and neck hurt and her arm felt as if it were "broken in half," requiring her to wear a brace for two months.

Evans was charged with felony hit-and-run, reckless driving, and three counts of attempted malicious wounding. The case was tried by a jury in February 2023. After the prosecution presented the evidence described above, Evans moved to strike, arguing (among other things) that the prosecution failed to prove that Evans caused the accident. Though the three women passengers testified to having "felt something," none of them had seen the Volkswagen strike the Durango, and the Durango showed no damage to its rear bumper. Evans blamed Wilson for the accident, arguing that he was driving drunk, speeding, and had refused to stop to let the women out. Evans also claimed that she had provided reasonable assistance to Wilson. The trial court denied the motion.

Wilson, Evans, and Evans's neighbor then testified for the defense. Evans's neighbor, Sherrie Holland, said she had examined the Volkswagen the day after the accident and photographed it several days later. Holland did not see any damage, and her photographs did not show any damage to the front bumper:

 

The photographs did not show the date they were taken.

In his testimony, Wilson confirmed that he had consumed two or three shots of Hennessy before getting into the Durango and meeting the three women. But he claimed that A.M. was driving the Durango at first. After Evans spotted them, Wilson said he told A.M. to speed up. He knew that Evans "wasn't going to be too happy" because he had taken the Durango without her permission and was driving around "with three other women."

Wilson said that, at some point, he and A.M. switched places while the Durango was moving, putting Wilson in the driver's seat again. Wilson admitted that he had been "trying to outrun" Evans and "trying to lose her." He said that the accident happened because he was "going too fast" and swerved to avoid an oncoming vehicle driving toward him in his lane, causing the Durango to flip over. Wilson admitted on cross-examination that he had been previously convicted of six felonies.

For her part, Evans testified that she went looking for Wilson out of concern that he "was out drinking, drunk, [and] crying over [their] son," who had passed away. When Evans spotted the car, she claimed that a woman was driving whom she only later learned was A.M. Evans said that A.M. had "smirked" before speeding away. Because Evans could not see anyone else in the Durango, and since Wilson wasn't answering her calls, Evans followed it. Evans insisted that she never got closer than 20 feet from the Durango and that her speed never exceeded 55

miles per hour. Evans said that she saw the Durango swerve to miss another vehicle and then flip over several times.

Evans admitted to driving past the wreckage and making a U-turn to come back. She also admitted to asking, "Was it worth it?," though she claimed to have directed that question to A.M., not Wilson. Evans admitted ordering Wilson to get in her car, but she claimed that "he was the one [who] was visibly injured." He was limping and "discombobulated." Evans said that she planned to take him to the hospital, but he refused. So she drove him to the home of her brother—an emergency medical technician—who examined him.

Evans excused her failure to assist the three women by saying she didn't know "what they [were] capable of." Evans worried that she was "too . . . pregnant" to defend herself against those "three girls." And after seeing that one of them had a phone, Evans figured that they could "assist themselves." Evans admitted that she never reported the accident to the police.

Evans renewed her motion to strike at the close of all evidence. She argued that her distance from the Durango, the absence of damage to either her front bumper or the Durango's rear bumper, and Wilson's swerving to avoid another car, proved that she was not a proximate cause of the accident. The trial court again denied the motion. Although the jury acquitted Evans of the attempted malicious-wounding charges, it found her guilty of felony hit-and-run.[2] The trial court denied her motion to set aside the guilty verdict. Evans was sentenced to one year of incarceration, suspended for one year on condition of good behavior and no contact with the three women. Evans noted a timely appeal.

---

[2] The jury deadlocked on the reckless-driving charge, which the trial court dismissed after declaring a mistrial on that indictment.

ANALYSIS

As cars became increasingly commonplace in the 20th century, States began enacting so-called "hit-and-run" statutes. *See Hit-and-Run Statute*, *Black's Law Dictionary* (12th ed. 2024). Such laws require "a motorist involved in an accident to remain at the scene and to give certain information to the police and others involved." *Id.* Virginia enacted its first hit-and-run statute in 1922. *See* 1922 Va. Acts ch. 407.

Our current hit-and-run statute is Code § 46.2-894. It imposes three categories of obligations on "[t]he driver of any vehicle involved in an accident in which a person is killed or injured or in which an attended vehicle or other attended property is damaged." Code § 46.2-894. These duties apply regardless of "whether the collision was intentional or unintentional." *Milazzo v. Commonwealth*, 276 Va. 734, 738 (2008). First, the driver must "stop as close to the scene of the accident as possible without obstructing traffic." Code § 46.2-894. Second, the driver must "report his name, address, driver's license number, and vehicle registration number forthwith" to certain specified persons. *Id.* That information must be reported "to the State Police or local law-enforcement agency, to the person struck and injured if such person appears to be capable of understanding and retaining the information, or to the driver or some other occupant of the vehicle collided with or to the custodian of other damaged property."[3] *Id.* And third, the driver must "render reasonable assistance to any person injured in

---

[3] We said in *Eubanks v. Commonwealth*, 18 Va. App. 537 (1994), that this list was "expressed disjunctively," so that reporting to any one of the listed recipients satisfied the statutory reporting requirement. *Id.* at 541. But that question remains open in the Supreme Court. *Compare Butcher v. Commonwealth*, 298 Va. 392, 398 (2020) (Kelsey, J.) (plurality opinion) ("Offering no opinion on the competing conjunctive/disjunctive interpretations of the statute, . . . we vacate the portion of the opinion of the Court of Appeals addressing that debate."), *with id.* at 404 (McCullough, J., concurring in the judgment) (concluding that the statute "imposes a conjunctive reporting requirement"), *id.* at 405 (Mims, J., concurring in the judgment) (agreeing that the statute "imposes a conjunctive requirement"), *and id.* at 408 (Koontz, SJ., concurring in the judgment) (rejecting the "conjunctive construction of the statute"

such accident, including taking such injured person to a physician, surgeon, or hospital if it is apparent that medical treatment is necessary or is requested by the injured person." *Id.*

The duties to stop, report, and render aid are "written in the conjunctive." *O'Connell v. Commonwealth*, 48 Va. App. 719, 733 (2006). The prosecution "can establish [a defendant's] guilt by proving [that the defendant] failed to perform any one of [those three] duties under the statute." *Id.*

Evans argues that the Commonwealth failed to prove beyond a reasonable doubt that she was a driver "involved" in a motor vehicle accident. She claims that she was not a proximate cause of the accident, let alone that her Volkswagen rear-ended the Durango. Assuming that she did cause the accident, Evans claims that she satisfied the requirement to render aid by taking Wilson for treatment while leaving the three other passengers behind. She reasons that the requirement in Code § 46.2-894 to assist "any person injured" is met by helping just one of several persons who are hurt. Finally, she claims that she met the reporting requirement, either because she reported her identifying information to the rental-car company, because she herself was the Durango's custodian, or because the prosecution failed to prove that she failed to disclose the required information to Wilson. *See supra* note 3.

> A. *The evidence sufficed to prove that Evans was "involved" in a motor vehicle accident.*

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). The relevant question is whether, after reviewing the evidence in the light most favorable to the prevailing party below, "*any*

---

because it "unduly requires the involvement of law enforcement authorities in so-called fender bender cases"). We do not reach that question here. *See infra* note 5.

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *O'Connell*, 48 Va. App. at 726 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). That standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony," weigh evidence, and draw "reasonable inferences from basic facts to ultimate facts." *Doggett v. Commonwealth*, 66 Va. App. 219, 225 (2016) (quoting *Jackson*, 443 U.S. at 319).

Controlling authority makes clear that a driver is "involved in an accident" within the meaning of Code § 46.2-894 when there is "physical contact between the driver's vehicle and another vehicle, person, or object, *or* the driver of a motor vehicle [is] a proximate cause of an accident." *Robinson v. Commonwealth*, 274 Va. 45, 53 (2007). The jury instruction here conformed to that standard and followed the model instruction. *See* Model Jury Instrs.—Crim. No. 32.300.

Evans argues that the photographs of the Volkswagen's pristine front bumper conclusively refute the prosecution's theory that Evans rear-ended the Durango. She notes that such "physical facts may overcome testimony when 'established by uncontroverted evidence, or by evidence so clearly preponderating as to make existence of such facts unmistakable.'" *See* Evans Br. 17-19 (quoting *Woodson v. Germas*, 200 Va. 205, 210 (1958)). In response, the Commonwealth points to the consistent testimony of the three women that they felt a jolt from the rear and felt the Durango lurch forward. The Commonwealth offered a theory to explain the absence of damage to the Volkswagen's front bumper: Evans was tailing the Durango at such a high speed that a small differential in their relative speeds allowed Evans to nudge the Durango out of control without leaving a mark on the Volkswagen's bumper. Alternatively, the Commonwealth opined for the first time at oral argument here that the jury could have

- 9 -

discredited Holland's photographs because Holland was Evans's friend and could have photographed the bumper after it had been repaired.

We need not resolve that disagreement or engage in speculation. We assume without deciding that Holland's photographs proved that Evans's Volkswagen did not make physical contact with the Durango. Even so, the evidence taken in the light most favorable to the Commonwealth sufficed for the jury to find that Evans was "a proximate cause" of the accident. *Robinson*, 274 Va. at 53.

The principles of proximate cause "are constant whether considered in a civil or criminal context." *Id.* (quoting *Gallimore v. Commonwealth*, 246 Va. 441, 447 (1993)). "Because an event can have more than one proximate cause, criminal liability can attach to each actor whose conduct is a proximate cause unless the causal chain is broken by a superseding act that becomes the sole cause of the [event]." *Rich v. Commonwealth*, 292 Va. 791, 800 (2016) (quoting *Brown v. Commonwealth*, 278 Va. 523, 529 (2009)).

Virginia follows "the long-accepted definition of proximate cause set forth by [our Supreme] Court in *Wells v. Whitaker*, 207 Va. 616, 622 (1966)." *Ford Motor Co. v. Boomer*, 285 Va. 141, 150 (2013). "The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces that event, and without which that event would not have occurred." *Id.* (quoting *Wells*, 207 Va. at 622). Although courts in some jurisdictions describe cause-in-fact as a separate requirement from "proximate cause," our Supreme Court considers cause-in-fact to be "a subset of proximate cause." *Id.* at 150 n.2.

"The first step in determining factual causation 'is often described as the "but for" or *sine qua non* rule.'" *AlBritton v. Commonwealth*, 299 Va. 392, 406 n.8 (2021) (quoting *Wells*, 207 Va. at 622). In general, conduct "is a factual cause of harm when the harm would not have

occurred absent the conduct." *Boomer*, 285 Va. at 155 (quoting Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 (2010)). This cause-in-fact test asks the counterfactual question whether the harm would not have occurred *but for* the tortious conduct.

Applying that test here, there was more than enough evidence for the jury to conclude that Evans's chasing the Durango was a cause-in-fact of the accident. *But for* the car chase, Wilson would not have tried to outrun Evans and the accident would not have occurred.

The second step in determining proximate cause asks whether a but-for cause is nevertheless so attenuated from the resulting harm that it fails to constitute a legal cause. *AlBritton*, 299 Va. at 406 n.8. "Although all legal causes are factual causes, there can be factual causes that are not legal causes." *Chapman v. Commonwealth*, 68 Va. App. 131, 141 (2017), *aff'd*, 296 Va. 386 (2018). This aspect of the proximate-cause inquiry has "been described as a shorthand descriptive phrase for the limits the law has placed upon an actor's responsibility for his conduct." *AlBritton*, 299 Va. at 406 n.8 (quoting *Wells*, 207 Va. at 622). "Generally, the issue of proximate causation is a question of fact to be resolved by a jury." *RGR, LLC v. Settle*, 288 Va. 260, 292-93 (2014). It is only "when reasonable people cannot differ [that] the issue becomes a question of law for the court to decide." *Id.* at 293. The Court helpfully described that proximate-cause spectrum in *Scott v. Simms*, 188 Va. 808 (1949):

> [T]here are cases in which . . . the absence of proximate cause is so apparent that the court is required so to hold as matter of law, . . . and . . . cases where . . . proximate cause is so demonstrated by the evidence that it exists as matter of law . . . . The cases that fall between those two classes are within the province of the jury. There is no yardstick by which every case may be measured and fitted into its proper place. In each case the problem is to be solved upon mixed considerations of logic, common sense, justice, policy and precedent.

*Id.* at 816 (citations omitted).

Whether Evans's chasing the Durango was too attenuated to be the legal cause of the accident here was a jury question. The jury could properly conclude that Evans's intentional or reckless conduct in chasing the Durango at high speed, knowing that Wilson wanted to get away, was sufficiently connected to the accident to warrant holding Evans responsible for the resulting crash. Indeed, it was foreseeable that such a high-speed chase could result in Wilson's losing control and crashing, imperiling the Durango's occupants as well as others on the highway. *See Gallimore*, 246 Va. at 447 ("An intervening act [that] is reasonably foreseeable cannot be relied upon as breaking the chain of causal connection between an original act of negligence and subsequent injury." (quoting *Delawder v. Commonwealth*, 214 Va. 55, 58 (1973))). "Questions of foreseeability of a risk . . . are ordinarily for the jury, unless reasonable men could not differ as to the result." *Maroulis v. Elliott*, 207 Va. 503, 511 (1966).

Precedents involving other high-speed chases and drag racing provide a persuasive analogy. In *Brown*, our Supreme Court found that the defendant's driving through traffic at high speed to elude a police officer was the proximate cause of another motorist's death that occurred when the pursuing officer accidentally crashed into the motorist. 278 Va. at 530. The "high-speed chase to apprehend [the defendant] and [the motorist's] death were a direct result of [the defendant's] reckless driving." *Id.*

In *Delawder*, the defendant was engaged in a drag race with Mook when Mook's car accidentally bumped the defendant's car, causing it to flip over and kill a pedestrian. 214 Va. at 56. The Court held that it was for the jury to determine whether Mook's criminal negligence broke the chain of causation resulting from the defendant's own criminal negligence. *Id.* at 58 ("The least that can be said of this case is that the evidence presented a jury question whether the defendant's negligence was remote, whether it was the sole cause of [the victim's] death, or whether it concurred with the negligence of Mook to cause the fatal injury."). The Court added

that Mook's striking the defendant's car—resulting in the defendant's losing control—"should have been foreseen by both drivers in the reckless circumstances under which they were operating their vehicles." *Id.* Evans and Wilson should likewise have foreseen the crash risk created by their own reckless conduct.

Similarly, in *O'Connell*, we upheld the involuntary-manslaughter conviction of one drag racer for the death of the other drag racer who was killed when *his* car lost control and crashed. 48 Va. App. at 728-32. We "reject[ed] the notion that 'negligence of a victim co-participant in a drag race is a complete defense if the victim's negligent conduct is a proximate cause of the victim's death.'" *Id.* at 731 (quoting *State v. Farner*, 66 S.W.3d 188, 200-01 (Tenn. 2001)). The same was true in *Doggett*, where "the co-participant's failure to maintain control . . . was a completely foreseeable event" in their drag racing. 66 Va. App. at 228-29.

The accident here was like the accidents that resulted from the intentional or reckless actions of the defendants in *Brown*, *Delawder*, *O'Connell*, and *Doggett*. *Accord* Restatement (Third) of Torts, *supra*, § 33(b) ("An actor who intentionally or recklessly causes harm is subject to liability for a broader range of harms than the harms for which that actor would be liable if only acting negligently."). Despite Wilson's own reckless conduct, Evans exacerbated the danger by persistently chasing him. Wilson's losing control and crashing could reasonably have been found by the jury to have been a direct and foreseeable consequence of Evans's intentional or reckless conduct.

*Robinson* is not to the contrary. The victim there crashed her car after passing Robinson on the highway. 274 Va. at 48. Reversing Robinson's hit-and-run conviction, the Supreme Court concluded that Robinson was not a proximate cause of the accident. *Id.* at 53-54. Although Robinson had initially sped up to prevent the victim from entering his lane, he realized the danger and slowed down in time to give her plenty of room to safely merge. *Id.* Unlike the

factfinder here, the trial court there "expressly found that Robinson was *not* a cause of the accident." *Id.* at 54 (emphasis added). The victim had "ample opportunity to slow . . . down once merging," but she lost control because she was driving too fast. *Id.* In this case, by contrast, the trier of fact expressly found that Evans caused the accident by chasing after Wilson until he crashed.

We also reject Evans's argument that Wilson's negligence was an intervening and superseding cause of the accident that cut off her own culpability. "A superseding cause occurs only when an intervening act so entirely supplants the operation of the initial tortfeasor's negligence that the intervening act *alone*, without any contributing negligence by the initial tortfeasor in the *slightest degree*, causes the injury." *Williams v. Joynes*, 278 Va. 57, 63 (2009) (emphases added). The superseding cause must be "a new cause of [the] injury, becoming the *only* proximate cause of that injury." *Id.* (emphasis added). And the "intervening act will never be deemed a superseding cause if the intervening act was set in motion by the initial tortfeasor's negligence." *Id.*

Evans failed to show that Wilson would have crashed the Durango by his actions "alone," *id.*, had Evans not been chasing him. Put another way, she failed to show that Wilson's negligence became "the only proximate cause" of the crash and that she did not contribute to it "in the slightest degree." *Id.* The jury could find beyond a reasonable doubt that Evans set in motion the events leading to the crash by tailing the Durango at high speeds for about an hour until Wilson lost control. Just as in the high-speed chase and drag-racing cases, the intentional or reckless acts of others was not a superseding cause of the defendant's actions in causing the victims' injuries. *See, e.g.*, *Brown*, 278 Va. at 530 (rejecting superseding cause argument because the defendant's actions in eluding the officer "put into operation" the high-speed chase that resulted in the innocent motorist's death); *Delawder*, 214 Va. at 58 (finding that the other

racer's reckless driving in striking the defendant's vehicle was not an intervening act that caused the bystander's death because that risk was "reasonably foreseeable").

   B. *The evidence sufficed to prove that Evans failed to provide reasonable assistance.*

Evans argues that the requirement to render aid to "any person injured," Code § 46.2-894, means helping any *one* person injured, even if multiple people have been hurt. So she claims that her helping Wilson was enough; she did not need to help the three young women.

Construing the requirements of Code § 46.2-894 presents a question of law that we review de novo. *E.g.*, *Flanders v. Commonwealth*, 298 Va. 345, 352 (2020). But we give deference to the factual finding that the evidence sufficed to prove the statutory element, asking only whether, taking the evidence in the light most favorable to the Commonwealth, "*any* rational trier of fact could have found th[at] essential element[] of the crime beyond a reasonable doubt." *O'Connell*, 48 Va. App. at 726 (quoting *Jackson*, 443 U.S. at 319).

Evans misinterprets the hit-and-run statute. Read in context, the plain meaning of helping "any person injured" means helping *every person* injured. "In this context, as in so many others, 'any' means 'every.'" *SAS Inst. Inc. v. Iancu*, 584 U.S. 357, 359-60 (2018). The adjective *any*, when used "[i]n affirmative sentences, . . . means 'every' or 'all,'" as in "any attempt to flout the law will be punished," or "you are required to produce any documents relating to the issue." Bryan A. Garner, *Garner's Modern English Usage* 71 (5th ed. 2022). Like the United States Supreme Court, our Supreme Court has interpreted *any* that way. *See Sussex Cmty. Servs. Ass'n v. Va. Soc. for Mentally Retarded Children*, 251 Va. 240, 244 (1996) ("The plain meaning of the phrase 'any covenant' encompasses *all* covenants of the type described in the statute . . . ." (emphasis added)). So have we. *See Montgomery v. Commonwealth*, 75 Va. App. 182, 194-95 (2022) ("The Virginia Supreme Court has held that '[t]he word "any," like other unrestrictive modifiers such as "an" and "all," is generally

considered to apply without limitation.'" (quoting *Sussex*, 251 Va. at 243)).  Evans's reading thus contradicts both precedent and standard usage.

Evans's reading also cannot be squared with caselaw that our hit-and-run statute protects *all persons* who are injured by the driver.  As the Supreme Court said in *Milazzo*, "[t]he purpose of Code § 46.2-894 is to protect *persons* injured as the result of, and to ensure the assessment of liability arising out of, an unfortunate vehicular event."  276 Va. at 738 (emphasis added).  Likewise, we have said that the statute was designed "to prevent motorists involved in accidents from evading civil or criminal liability by leaving the scene of an accident and to require drivers involved in an accident to provide identification information and render assistance to *injured parties*."  *Smith v. Commonwealth*, 66 Va. App. 382, 388 (2016) (emphasis added) (quoting *Smith v. Commonwealth*, 8 Va. App. 109, 115 (1989)).  Thus, "[t]he assistance requirement advances public safety."  *Johnson v. Commonwealth*, 14 Va. App. 769, 771 (1992) (per curiam).  Those highly remedial purposes would be undercut by allowing a driver who injures multiple victims to pick just one of them to help.

Evans acknowledged to us at oral argument that her helping-one-victim-is-enough theory does not appear to have been advanced in any prior case, whether in Virginia or elsewhere.  But this is not the first case in which a hit-and-run driver has left multiple victims behind.  In *Cottee v. Commonwealth*, 31 Va. App. 546 (2000), for instance, Cottee ran over and injured two people.  *Id.* at 551-52.  We said both were Cottee's "victims."  *Id.* at 558.  And we upheld Cottee's conviction because he "knew or should have known of the *victims'* injuries."  *Id.* (emphasis added).

We credit Evans's statutory argument as novel but reject it as implausibly stingy.  The statutory mandate to render reasonable assistance to "any person injured" does not allow the driver to pick and choose which of several victims to help.

- 16 -

Next, Evans argues that the Commonwealth failed to prove that she knew that the three women passengers were injured. She says that she rendered reasonable assistance to Wilson because he "was the only person 'visibly injured.'" Evans Br. 11. We are not persuaded.

To be sure, knowledge "is an essential element of the crime" of hit-and-run. *Payne v. Commonwealth*, 277 Va. 531, 544 (2009) (quoting *Herchenbach v. Commonwealth*, 185 Va. 217, 220 (1946)). "[T]he Commonwealth must prove that the defendant possessed actual knowledge of the occurrence of the accident, and such knowledge of injury which would be attributed to a reasonable person under the circumstances of the case." *Id.* at 544-45 (alteration in original) (quoting *Kil v. Commonwealth*, 12 Va. App. 802, 811 (1991)). This requires the Commonwealth to prove "subjective knowledge of the collision while holding the driver to a stricter reasonable man standard as to the fact or extent of the injury." *Kil*, 12 Va. App. at 810 (quoting *Commonwealth v. Kauffman*, 470 A.2d 634, 637 (Pa. Super. Ct. 1983)). In other words, the driver need not have "positive knowledge of the extent of the damage or injuries inflicted." *Payne*, 277 Va. at 544 (quoting *Herchenbach*, 185 Va. at 220). The question is whether the driver "knew or should have known" that a victim was injured.[4] *Id.* at 545.

Evans admits that she saw the Durango lose control, roll over, and land upside down. So the only remaining question about her state of mind is whether the jury could find from the evidence that Evans knew or should have known that one or more of the three women passengers had been injured.

"Knowledge of injury may be imputed to a driver 'where the fact of personal injury is visible or where the seriousness of the collision would lead a reasonable person to assume there

---

[4] Virginia is in the mainstream of jurisdictions allowing evidence that the defendant "knew or should have known" of the injury to support a hit-and-run conviction. *See* Marjorie A. Caner, Annotation, *Necessity and Sufficiency of Showing in Criminal Prosecution Under "Hit-and-Run" Statute, Accused's Knowledge of Accident, Injury, or Damage*, 26 A.L.R. 5th 1, 22 (1995).

must have been resulting injuries.'" *Neel v. Commonwealth*, 49 Va. App. 389, 395 (2007) (quoting *People v. Carter*, 52 Cal. Rptr. 207, 208 (Cal. Ct. App. 1966)). In *Neel*, we found "the minimal nature of the damage to [the victim's] vehicle [to be] insufficient to put [the defendant] on notice that [the victim] had been injured." *Id.* at 397. *See also Brannon v. Commonwealth*, 52 Va. App. 800, 806 (2008) (finding insufficient evidence to support the conviction when the other driver had no visible injuries, got out of her car, and walked over to the defendant's truck to ask about his well-being). In *O'Connell*, by contrast, we reasoned that the driver "must have known" that the victims in the other car "had been seriously injured or lay dying" because their car had "struck [a] tree at a high rate of speed." 48 Va. App. at 736.

There was enough evidence here from which the jury could find that Evans knew or should have known that the three women who survived the terrible crash were indeed injured. Evans knew for sure that Wilson was bleeding, limping, and dazed. Auriona was wearing shorts and her exposed knees were "visibly" injured; they were "all banged up" from the accident and from having to crawl over broken glass to escape. And since Evans witnessed the rollover and saw the Durango land upside down, as pictured above, the jury could reasonably find that Evans knew or should have known that the three women, like Wilson, also must have been hurt. We held more than a decade ago that a person with soft-tissue injuries is "injured" under the hit-and-run statute. *See Belew v. Commonwealth*, 62 Va. App. 55, 63 (2013) ("[T]he ordinary meaning of the word 'injury' leads to the conclusion that a so-called 'soft tissue' injury such as muscle pain or damage constitutes harm, damage, or hurt and is therefore sufficient to prove an injury under Code § 46.2-894."). So the jury had enough evidence to conclude that Evans knew or should have known that the three women who managed to crawl from the wreckage and stand up were nonetheless injured.

We reject Evans's remaining explanations for not helping them: that the three women had not affirmatively asked for her help, that one of them had a phone, and that Evans feared that they outnumbered her. To start, the jury could have properly discredited those excuses as lies by Evans to conceal the reason she abandoned the victims. *See, e.g.*, *Maust v. Commonwealth*, 77 Va. App. 687, 703 (2023) (en banc) ("[I]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." (quoting *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018))). As the prosecution argued in closing, the evidence showed that Evans was angry. Wilson had left in the middle of the night without telling her, leaving Evans home alone when she was eight months pregnant. Wilson took the Durango she rented without her permission. He then drove around town with three young women, refusing to answer her repeated calls or pull over, leading her to chase after him for upwards of an hour. Her fury was apparent after the crash. She questioned Wilson if it was "f---ing worth it" before ordering him to "get [his] stupid ass in the car."

Even taking Evans's statements at face value, they would not excuse her failure to stop and render reasonable assistance to the injured women. It did not matter that the women did not ask her for help. Nor did it matter that she noticed that Auriona had a phone. As we said in *Johnson*, the assistance requirement "[does not depend] upon the victim's desire to receive aid. Injury may allay contentiousness, and an injured antagonist may be glad to receive aid from any quarter." 14 Va. App. at 771. And just as in *Johnson*, the record here "does not disclose that [the victims] would have rejected aid." *Id.* In any event, Evans left without asking the women if they needed help, thus denying them the chance to accept it. *See Aley v. Commonwealth*, 75 Va. App. 54, 66 (2022) (explaining that the "duty to render reasonable assistance" applies "not

only 'if it is apparent that medical treatment is necessary' but also if it 'is requested by the injured person'" (quoting Code § 46.2-894)).

And if the survivors were reluctant to ask for *her* help unprompted, no one could blame them. The women had just survived a terrifying rollover accident caused by Evans's "acting crazy" and chasing them. The jury could likewise reject Evans's claim that she failed to help the women for fear they outnumbered her. After all, nothing stopped Evans from using her own phone to call for help, let alone asking the women if they were okay.

In short, Evans had a statutory duty to "stop at the scene of the accident . . . and render reasonable assistance." *Johnson*, 14 Va. App. at 771 (quoting *Smith*, 8 Va. App. at 115). The jury had ample basis to find that Evans violated that duty here.[5]

## CONCLUSION

The evidence sufficed for the jury to find beyond a reasonable doubt that Evans was involved in the accident at issue, that Evans knew or should have known that the women were injured, and that Evans failed to stop and render reasonable assistance to them. Thus, we see no basis to set aside her conviction for felony hit-and-run.

*Affirmed.*

---

[5] Having found that Evans was "involved" in this accident and failed to render aid to injured persons, we do not need to reach whether she also failed to provide her identifying information to one or more of the persons listed in Code § 46.2-894. Resolving that question would require reexamining whether the list of persons to whom the driver's information must be reported is conjunctive or disjunctive. *See supra* note 3. So we heed Justice Kelsey's warning in *Butcher* to not decide that question unnecessarily when "the attempt to untangle [that] language . . . involves no easy task and results in no confident consensus." 298 Va. at 397 (plurality); *see also id.* at 407-08 (Mims, J., concurring in the judgment) (urging the General Assembly to clarify the notification requirement).

- 20 -